IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DARNELL VEAL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:18-CV-621-MAB |
| | ) |
| DAVID RAINS, PHILLIP B. MARTIN, | ) |
| VIPIN SHAH, MONICA CARRELL, | ) |
| and ZACHARY BEAN, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on the motion for summary judgment filed by Defendant Vipin Shah (Doc. 82). For the reasons outlined below, the motion is granted.

### BACKGROUND

In March 2018, Plaintiff Darnell Veal filed this action pursuant to 42 U.S.C. § 1983 alleging officials and medical providers at Robinson Correctional Center were deliberately indifferent to a tumor on his back and his neck and back pain and/or osteoarthritis (Doc. 1; Doc. 9). Following a threshold review of the complaint pursuant to 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on Eighth Amendment claims against Dr. Vipin Shah, Warden David Rains, Healthcare Unit Administrator Phil Martin, correctional counselor Monica Carrell, and correctional officer Zachary Bean (Doc. 9).

On July 1, 2020, Dr. Shah filed a motion for summary judgment on the merits of

Plaintiff's claim (Doc. 82; Doc. 83).[1] Plaintiff filed his response on August 3, 2020 (Doc. 86).[2] Dr. Shah did not file a reply.

## FACTS

Plaintiff Darnell Veal was incarcerated in the Illinois Department of Corrections at Robinson Correctional Center from 2015 to May 2018 (Doc. 83-1, pp. 39, 41–42). On April 29, 2016, Plaintiff went to nurse sick call and reported that he woke up from a nap with pain in his back that radiated into his shoulder (Doc. 83-2, pp. 38–41; Doc. 83-3, pp. 9–10). He reported his pain level was a nine out of ten and he experienced pain turning left or right, laying down, sitting up, or standing. The nurse noted a "soft" lump on Plaintiff's upper left back measuring 7.5cm by 8.5cm (2.95in. by 3.35in.) (Doc. 83-3, pp. 9–10). She called Dr. Vipin Shah and he instructed her to provide Plaintiff with 800mg of ibuprofen, three times per day, a lower bunk permit, and a temporary lay-in permit (*Id.*).

Plaintiff went back to nurse sick call on May 7th complaining of pain from the lipoma, which he rated as a nine out of 10 (Doc. 86, pp. 55–56). He said it hurt when he tried to "lift, bend, or anything." The nurse noted Plaintiff had a "softball size swollen area" on his left upper back that was painful to touch. Like the first nurse, however, this nurse noted there was no gait disturbance or change from sitting to standing—Plaintiff

---

[1] None of the other four Defendants moved for summary judgment.

[2] The Court notes that Plaintiff was granted leave to file a response brief that did not exceed 30 pages (Doc. 85). Plaintiff, however, ignored that page limit and filed a 44-page brief (Doc. 86, pp. 1–44). The Court, however, opts not to strike the offending pages and will consider the entirety of Plaintiff's brief.

did both with a straight back. The nurse contacted Dr. Shah, who said to provide Plaintiff with 600mg of ibuprofen, three times per day.

Dr. Shah then saw Plaintiff two days later, on May 9th (Doc. 83-2, pp. 44–48; Doc. 83-3, p. 11). Plaintiff told Dr. Shah that his pain started on April 29th (*see also* Doc. 83-1, p. 180). Dr. Shah noted that there was subcutaneous (meaning the layer of tissue just under the skin) swelling on Plaintiff's upper left back that measured about three inches by two inches. He wrote that it was not tender to the touch and the surrounding tissue was normal. Dr. Shah assessed that it was a lipoma. Dr. Shah testified that a lipoma is a benign fatty tumor (Doc. 83-2, pp. 48–50).[3] The vast majority of lipomas do not cause pain and do not require any treatment (*Id.* at p. 51). Dr. Shah testified that he would recommend a lipoma be surgically removed if it was impacting nerves or the patient's daily activities (like taking a shower, brushing their teeth, or walking around), or the lipoma continued to grow (*Id.* at pp. 27–28, 61). It was Dr. Shah's impression that because Plaintiff's lipoma was located in the subcutaneous tissue, it would not be pressing on any nerves and was unlikely to cause pain (*Id.* at pp. 51–52). Dr. Shah also did not observe any objective signs of significant pain or distress, such as trouble walking, sitting down, or getting up; facial grimaces; elevated pulse; or elevated blood pressure (*Id.* at pp. 53,

---

[3] According to the Mayo Clinic, a lipoma is a slow-growing, fatty lump that commonly occur on the back. *Lipoma*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/lipoma/symptoms-causes/syc-20374470 (last visited March 27, 2021). A lipoma "usually is harmless," "usually isn't tender," and "is rarely a serious medical condition." *Id.* However, it can be painful if it grows and presses on nearby nerves or contains many blood vessels. *Id.* "Treatment generally isn't necessary, but if the lipoma bothers [the patient], is painful or growing, [the patient] may want to have it removed." *Id.*

62). But because Plaintiff complained of pain, Dr. Shah prescribed 400 mg ibuprofen three times per day, for 30 days, along with exercise and weight loss (Doc. 83-2, pp. 46, 53–54; Doc. 83-3, p. 11).

On June 1st, Plaintiff went back to nurse sick call and reported pain from the lipoma, which he rated as a seven out of ten (Doc. 86, p. 60). The nurse noted that Plaintiff walked "slow and stiff" and moved "slow." The nurse gave Plaintiff 200 mg of ibuprofen, one to two times per day, for three days.

Dr. Shah saw Plaintiff on June 6th (Doc. 83-2, pp. 67–70; Doc. 83-3, p. 12). Dr. Shah wrote that Plaintiff said he had the growth since 2009, which is different than what he told Dr. Shah at the first appointment. Dr. Shah wrote that the lipoma measured three inches by three inches, but also indicated the lipoma was the "same size." He prescribed 400mg of ibuprofen, three times per day, for 30 days.

On July 18th, Plaintiff went to nurse sick call and complained of pain in his back and left hand from arthritis, which he rated as a seven out of ten (Doc. 86, p. 63). The nurse gave Plaintiff 200mg of ibuprofen, one to two times per day, for three days. The nurse did not refer Plaintiff to see the doctor.

This scenario repeated a number of times over the course of the next year. Plaintiff reported to nurse sick call and complained of arthritis pain on August 2 and November 20, 2016, March 1, 2017, March 4, and March 7 (Doc. 86, pp. 65–70). Each time, Plaintiff rated his pain as a six, a seven, or an eight out of ten, and the nurse gave him a three-day supply of ibuprofen or acetaminophen but did not refer him to see the doctor (*Id.*). Plaintiff went back to nurse sick call on March 28, 2017, complaining about arthritis pain

and he told the nurse that ibuprofen did not help (Doc. 86, p. 71). Plaintiff then saw Dr. Shah a week later on April 5th for his complaints of arthritis pain (Doc. 83-2, pp. 75–78; Doc. 83-3, p. 13). Dr. Shah noted there was no chronic distress and Plaintiff's vital signs were normal. He prescribed Plaintiff 500mg of acetaminophen for 30 days.

Approximately three weeks later, on April 25th, Plaintiff went to nurse sick call and complained of pain in his left shoulder from a "tumor", which he rated as an eight out of ten (Doc. 86, p. 74). This visit came almost exactly one year from the first visit at which Plaintiff complained of pain from the lipoma (*see* Doc. 83-3, pp. 9–10). He told the nurse, however, that he'd had the "tumor" for two years (Doc. 86, p. 74). He reported that it hurt when he moved his left arm, and he also complained about pain in different areas of his body from arthritis. The nurse noted that Plaintiff was taking more Tylenol per day than was prescribed and he needed to take it as ordered. The nurse gave Plaintiff a three-day supply of ibuprofen.

The Health Care Unit Administrator, Phil Martin, wrote a note in the medical record dated April 28, 2017, indicating that he reviewed a grievance from Plaintiff regarding left shoulder pain due to a "tumor" (Doc. 86, p. 75).[4] Martin noted that because Plaintiff complained of "renewed pain more frequently," he would refer Plaintiff to the doctor to evaluate the lipoma for size changes and to evaluate Plaintiff's complaints of pain.

---

[4] It is not clear which grievance Martin was referencing or whether it is part of the record (*see* Doc. 83, Doc. 86).

Dr. Shah accordingly saw Plaintiff three days later on May 1st (Doc. 83-2, pp. 79–82; Doc. 83-3, p. 14). Dr. Shah noted that the lipoma measured three inches by three inches and had not changed in size. He once again prescribed Plaintiff 500mg of Tylenol, but increased it to twice a day, and he wrote the prescription for six months. Dr. Shah also noted that he "reassured" Plaintiff, which he testified meant that he "must have told him that don't worry it's not a cancer."

Plaintiff reported to nurse sick call on August 23rd, reporting additional painful lumps in his abdomen, chest, shoulder, and thigh (Doc. 86, p. 78). He rated his pain as a five out of ten. The nurse noted there were no obvious signs of discomfort, redness, or warmth. The nurse noted that she could not see but could feel the lumps on the abdomen, chest, and shoulder, however, the lump on the thigh could be seen and felt.

Dr. Shah saw Plaintiff the following day (Doc. 83-2, pp. 82–87; Doc. 83-3, pp. 15–16). Dr. Shah examined Plaintiff and diagnosed the lumps as additional lipomas. Dr. Shah put Plaintiff on a weight loss diet and recommended exercise. He also ordered a blood test to check Plaintiff's cholesterol and thyroid to see if those were the potential cause of the additional lipomas. Plaintiff also complained that day about his arthritis. Dr. Shah ordered an x-ray of Plaintiff's right hand and left knee, which showed his right hand was normal and showed minimal degenerative changes in his left knee (Doc. 83-3, p. 22; Doc. 86, p. 81). Dr. Shah diagnosed Plaintiff with "minimal degenerative arthritis." He

continued Plaintiff on Tylenol but also added Mobic, which he testified was a "long-acting, continuous pain relief" medication.[5]

The next time Dr. Shah saw Plaintiff was on November 27, 2017, when Plaintiff was in the infirmary for another condition (Doc. 83-2, p. 89; Doc. 83-3, p. 18; Doc. 86, p. 86). Dr. Shah continued Plaintiff's prescription for Mobic for another six months.

Dr. Shah saw Plaintiff again on December 4th and 7th for complaints related to arthritis pain (Doc. 83-2, pp. 89–91; Doc. 83-3, pp. 19–20). Plaintiff's prescription for Tylenol was renewed, and Dr. Shah told him to take both the Tylenol and the Mobic.

Plaintiff had a follow-up visit for his arthritis on January 8, 2018 (Doc. 83-2, pp. 91–92; Doc. 83-3, p. 21). Specifically, Plaintiff complained of pain in his knee, lower back, and hip. He asked for stronger medication, and Dr. Shah increased the dosage of Mobic from 7.5mg to 15mg. This was the last time Dr. Shah saw Plaintiff before he was released on parole in May 2018 (*see* Doc. 83-3; Doc. 86, pp. 53–89).

Plaintiff had the lipoma surgically removed in February 2019 (Doc. 83-1, p. 90). Since the surgery, he has not experienced any pain in the area where the tumor was located. Plaintiff also receives monthly injections for his arthritis and also has 800mg of ibuprofen that he uses occasionally to help manage flare-ups (Doc. 83-1, p. 100).

---

[5] Mobic (generic name meloxicam) is used to treat pain and inflammation from arthritis. It is a nonsteroidal anti-inflammatory drug, like ibuprofen, but is considered a stronger medication than ibuprofen. It is available only by prescription, while ibuprofen is available over the counter. Mobic is a long-acting medicine that only needs to be given once a day, while ibuprofen in its usual form needs to be given multiple times per day. Carmen Fookes, BPharm, *Meloxicam vs. Ibuprofen, What's the Difference?*, https://www.drugs.com/medical-answers/difference-between-meloxicam-ibuprofen-3504403/ (last visited March 22, 2021)

### DISCUSSION

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court may not "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted); *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). Instead, "it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen,* 763 F.3d at 836.

The Eighth Amendment's proscription against cruel and unusual punishment imposes an obligation on states "to provide adequate medical care to incarcerated individuals." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1072 (7th Cir. 2012) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials violate this proscription when they act with deliberate indifference to the serious medical needs of an inmate." *Holloway*, 700 F.3d at 1072 (citations omitted). To succeed on a claim for deliberate indifference, a

plaintiff must demonstrate that they suffered from an "objectively serious medical condition" and that the defendant acted with a "sufficiently culpable state of mind," namely deliberate indifference. *Goodloe v. Sood*, 947 F.3d 1026, 1030–31 (7th Cir. 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994)).

Dr. Shah argues that Plaintiff's lipoma and arthritis were not objectively serious medical conditions (Doc. 83, pp. 13–15). The Court need not address that prong of the analysis because even if the Court assumes that Plaintiff's lipoma and arthritis presented sufficiently serious medical conditions, the evidence when viewed in a light most favorable to Plaintiff does not establish a genuine issue of fact as to whether Dr. Shah acted with deliberate indifference.

For medical professionals, the deliberate indifference standard has been described as the "professional judgment" standard. *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008). Treatment decisions are "presumptively valid" and entitled to deference so long as they are based on professional judgment—meaning they are fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm, and the efficacy of available treatments—and do not go against accepted professional standards. *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019) (citation omitted); *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017); *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011). A medical professional may be held to have displayed deliberate indifference if the treatment decision was "blatantly inappropriate" even to a layperson, *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (a jury can infer deliberate indifference when "a risk from a particular

course of medical treatment (or lack thereof) is obvious."), or there is evidence that the treatment decision was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Petties*, 836 F.3d at 729; *see also Pyles*, 771 F.3d at 409 ("A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances'") (citation omitted).

Plaintiff alleges that while he was incarcerated at Robinson Correctional Center over the course of approximately two years, Dr. Shah was deliberately indifferent to his lipoma and arthritis causing him severe and unnecessary pain and that he was not given the medical treatment that he needed. Plaintiff began complaining about pain from a lump on his back in late April 2016. Dr. Shah saw Plaintiff for the first time about the lump in early May 2016. Dr. Shah determined the lump was a lipoma and he gave Plaintiff a 30-day supply of ibuprofen. When Plaintiff came back approximately one month later, Dr. Shah gave him another 30-day supply of ibuprofen. There is no indication that Plaintiff ever told Dr. Shah the ibuprofen was ineffective (*see* Doc. 83-1; Doc. 83-3; Doc. 86). Plaintiff did not complain about the lipoma again until April 25, 2017 when he reported to nurse sick call (*see* Doc. 86, pp. 22–23). He saw Dr. Shah six days later, and Dr. Shah increased Plaintiff's prescription for Tylenol to 500mg, twice a day, for six months. In other words, the record demonstrates that Dr. Shah responded to Plaintiff's complaints about the lipoma on his upper back by examining it, diagnosing it, monitoring its size over time, and prescribing pain medications to treat Plaintiff's

subjective complaints of pain.

Plaintiff nevertheless claims that Dr. Shah was deliberately indifferent with respect to the lipoma because the doctor never told Plaintiff his diagnosis or explained to him that it was not cancerous, never removed the tumor, never conducted a biopsy or other diagnostic test, and never referred him to see a specialist (Doc. 86, pp. 31–32; Doc. 83-1, pp. 181–82). Instead, Dr. Shah persisted in a course of ineffective treatment in the form of over-the-counter pain medication which did not relieve Plaintiff's severe pain (Doc. 86, pp. 31–32).

Plaintiff claims Dr. Shah only called the lump on his back a "tumor" and never told him that it was a lipoma (Doc. 83-1, pp. 61–62). In fact, Plaintiff claims, the first time he ever heard the lump called a lipoma was after his surgery to remove it in February 2019 (*Id.*). However, a counselor's response to Plaintiff's grievance dated April 29, 2016 indicates that Plaintiff was evaluated and treated "for a lipoma. Given pain medication and education on issue" (Doc. 51-3, p. 23). Similarly, a counselor's response to Plaintiff's grievance dated May 9, 2016, indicates he was "diagnosed w/ lipoma (benign fatty-like tumor)." (*Id.* at p. 22). And Dr. Shah's notes from the visit on May 1, 2017 regarding the lipoma indicate that he "reassured" Plaintiff, which he testified meant that "must have told him that don't worry it's not a cancer." Thus the record demonstrates that Plaintiff was, in fact, told multiple times that he had a lipoma and it was not cancerous. To the extent that Plaintiff remained confused or unaware of the nature of the lump and the lack of risk that it posed, that is certainly lamentable, but it in no way suggests that Dr. Shah was deliberately indifferent to the lipoma.

Second, Dr. Shah testified that he did not see any clinical indication that diagnostic testing, such as a biopsy or an ultrasound, was necessary (Doc. 83-2, pp. 57–61). "[T]he decision to forgo diagnostic tests 'is a classic example of a matter for medical judgment.'" *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)). Plaintiff did not submit any evidence whatsoever from which a jury reasonably could find that Dr. Shah's exercise of medical judgment departed significantly from accepted professional norms (*see* Doc. 86).

Dr. Shah also testified that he did not believe surgery was necessary because Plaintiff's lipoma was not growing or affecting his activities of daily living (Doc. 83-2, p. 61). Plaintiff disputes that the lipoma did not grow (Doc. 86, pp. 40–41). He points first to his own unadorned assertion that between April 2016 and his release from Robinson approximately two years later, the lipoma "increased. It grew." (Doc. 83-1, pp. 180–181). But Plaintiff did not explain the basis for his belief that the lipoma had grown. And the Court presumes that he was not able to independently observe it or measure it given that it was on his back. Plaintiff also points to the medical records as evidence that the lipoma increased in size. The medical records show that the first measurement by a nurse in April 2016 was approximately three inches by three inches. Then in May 2016, Dr. Shah wrote that it measured three inches by two inches. And in June 2016, Dr. Shah wrote that it measured three inches by three inches. Dr. Shah initially testified that Plaintiff's lipoma "did not keep on growing (Doc. 83-2, p. 61). But later, when Plaintiff's counsel said the medical records showed the lipoma had grown by one inch between the second and third measurements, Dr. Shah agreed (*Id.* at p. 69). Dr. Shah's counsel followed up on this line

of questioning, and asked him to explain how the lipoma went from three by three inches, to three by two inches, to three by three inches over the course of only two months (*Id.* at pp. 98–99). Dr. Shah testified that the second measurement—the three by two measurement—was "probably [a] misprint," and he stated that he did not believe the size of the lipoma changed between April and June 2016 (*Id.* at pp. 99–100). He later affirmed that there was no material change in the size of the lipoma throughout the 21 months (approx.) that he treated Plaintiff (*Id.* at p. 101). Simply put, the medical records indicate that the lipoma was the same size in June 2016 as it was in April 2016 and there is no competent evidence that it grew any larger before Plaintiff's release in prison in May 2018.[6] In looking at the evidence as a whole, no reasonable jury could conclude anything other than the lipoma remained roughly the same size while Plaintiff was in prison.

Plaintiff also claims that the lipoma "caused him to experience significant functional limitations to his daily activities" (Doc. 86, p. 64). But the evidence he cited to does not support that claim. The medical records include vague notations that he self-reported a limited range of motion due to pain from the lipoma, *e.g.*, "limited range of motion due to pain," and "complained of pain with bending or lifting heavy" (Doc. 83-2, p. 56; Doc. 86, pp. 54, 56). None of the nurses documented that they objectively tested and observed functional limitations (*see id.*). Plaintiff testified that it was hard to lay down on his back or on his left side (Doc. 83-1, p. 74). He also testified that he "had a problem with

---

[6] Notably, none of Plaintiff's post-prison medical records regarding his lipoma treatment were submitted to the Court. It stands to reason that the surgeon who removed the lipoma, (*see* Doc. 83-1, p. 90), would have noted the size of the lipoma somewhere in their records.

carrying weight," namely lifting up very heavy pans of food at his job in dietary, but he went on to say that the problem lifting was that he would "get a tingly feeling where [he] couldn't hold on to anything," and that feeling was unrelated ,to and not caused by the lipoma (*Id.* at pp. 74–75). He later testified that the tumor *and* his arthritis caused limitations, "lifting, holding, and handling altogether" (*Id.* at pp. 191–92).[7] All of this is to say, there is simply nothing that indicates the lipoma in and of itself, and separate and apart from the arthritis, significantly limited Plaintiff's ability to perform basic functions essential to everyday life such that surgery to remove it was plainly called for and the decision not to recommend it was obviously wrong and "blatantly inappropriate."

Plaintiff also did not submit any expert evidence that Dr. Shah's decision not to remove the lipoma was a substantial departure from accepted professional practice. And the fact that a physician who examined Plaintiff after his release from prison decided to remove the lipoma is not sufficient to conclude that Dr. Shah should have done so. "[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim." *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (emphasis in original); *see also Pyles*, 771 F.3d at 409 ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the

---

[7] He testified that the tumor made it difficult to lift and hold heavy things because "the tumor had grown into the tissue, the muscle. And when it grew into the muscle, that's when it became a problem" (Doc. 83-1, p. 192). Plaintiff, however, is not qualified to offer this type of medical evidence regarding the specific nature and progression of his tumor, and he did not submit any competent medical evidence demonstrating that what he said was true (*see* Doc. 86). Consequently, the Court will not consider this statement by Plaintiff.

proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.").

Finally, Dr. Shah also testified that he believed the over-the-counter pain reliever he prescribed to Plaintiff was sufficient because after considering Plaintiff's subjective complaints and the lack of objective findings from physical exams, he did not believe that Plaintiff's pain was significant (Doc. 83-2, pp. 16–17, 61–62). The evidence thus establishes that Dr. Shah's decision regarding medication was based on his professional judgment rather than "gratuitous cruelty." *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (citation omitted). His decision is entitled to deference unless Plaintiff puts forth evidence that "no minimally competent person would have so responded under those circumstances," which he did not (*see* Doc. 86).

As for the arthritis pain, it is undisputed that the first time Plaintiff complained to Dr. Shah was on April 5, 2017 (*see* Doc. 86, p. 10). Dr. Shah noted that Plaintiff was "not with any chronic distress" and his vital signs were normal. He prescribed Plaintiff 500mg of acetaminophen for 30 days. Approximately one month later, in May 2017, Dr. Shah doubled Plaintiff's dosage of Tylenol in response to his complaints about his lipoma (but the pain medication obviously would have addressed his arthritis pain as well) and gave him a six-month prescription. Dr. Shah saw Plaintiff again in August 2017. This time he ordered x-rays of Plaintiff's right hand and left knee. Based on the results, Dr. Shah diagnosed Plaintiff with "minimal degenerative arthritis." He continued Plaintiff on Tylenol but also added Mobic. A couple months later he continued the prescription for Mobic. And when Plaintiff asked for stronger medication, Dr. Shah doubled his dosage

of Mobic. The record thus demonstrates that Dr. Shah was responsive to Plaintiff's complaints of arthritis pain. He initially prescribed Tylenol based on his professional assessment of Plaintiff's medical history and the lack of objective indications of pain. When Plaintiff's complaints continued, Dr. Shah ordered diagnostic imaging to confirm that Plaintiff was not suffering from anything other than normal, degenerative arthritis caused by aging. The doctor also added in a stronger pain medication. He subsequently doubled the dosage after Plaintiff said it was not strong enough.

Plaintiff nevertheless claims that Dr. Shah was deliberately indifferent because the doctor never told Plaintiff what type of arthritis he had and did not prescribe strong enough pain medication (Doc. 86). However, the record clearly demonstrates that Plaintiff knew he had arthritis (*see, e.g.,* Doc. 83-1, pp. 47–48; Doc. 86, pp. 63, 67, 74). Furthermore, he testified that he was told at Robinson Correctional Center that he had degenerative arthritis and he was also told "you're just getting old and you're getting arthritis" (Doc. 83-1, pp. 49–50). Once again, to the extent that Plaintiff did not understand what degenerative arthritis entailed, it is unfortunate, but it in no way suggests that Dr. Shah was deliberately indifferent.

Furthermore, Dr. Shah's decision to employ conservative measures to treat Plaintiff's pain with medication in a step-wise fashion was not blatantly inappropriate and it is entitled to deference unless Plaintiff puts forth evidence that "no minimally competent person would have so responded under those circumstances," which he has not (*see* Doc. 86).

Accordingly, Plaintiff has failed to demonstrate a material issue of fact as to whether Dr. Shah was deliberately indifferent to his lipoma and/or arthritis, and Dr. Shah is entitled to summary judgment.

## CONCLUSION

The motion for summary judgment filed by Defendant Vipin Shah (Doc. 82) is **GRANTED.** Dr. Shah is **DISMISSED with prejudice** as a Defendant in this case and judgment will be entered in his favor at the close of the case.

This matter will proceed to trial on the following claims against the following Defendants:

> **Count 1 –** Martin, Rains, and Carrell were deliberately indifferent to Plaintiff's tumor in violation of the Eighth Amendment;
>
> **Count 2 –** Rains, and Carrell were deliberately indifferent to Plaintiff's back pain and/or osteoarthritis in violation of the Eighth Amendment;
>
> **Count 3 –** Bean was deliberately indifferent to Plaintiff's request for medical attention on a single occasion in violation of the Eighth Amendment.

A status conference to discuss the trial schedule and the utility of a settlement conference will be set by a separate Order.

**IT IS SO ORDERED.**

**DATED: March 29, 2021**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**